STATE OF CONNECTICUT *v.* FRANK P. SCARANO

BALDWIN, C. J., KING, MURPHY, SHEA and ALCORN, Js.

Argued October 11—decided November 7, 1961

*Alfonse C. Fasano,* with whom was *Bernard A. Pellegrino,* for the appellant (defendant).

*George R. Tiernan,* assistant state's attorney, with whom, on the brief, was *Arthur T. Gorman,* state's attorney, for the appellee (state).

BALDWIN, C. J. The defendant has appealed from a judgment of guilty on each of four counts of an information charging him with violations of General Statutes § 53-348, which, inter alia, makes it a crime to utter counterfeit money, or permit it to be uttered with the intent of defrauding another.[1]

---

[1] "Sec. 53-348. COUNTERFEITING. Any person who counterfeits any gold or silver coins, or passes or gives, or offers to pass or give, counterfeit gold or silver coins in payment, or permits the same to be uttered or passed with intent to defraud another, or has in his possession any such coin or any forged or counterfeited promissory

The assignments of error pressed in oral argument and briefs in this court are, stated concisely, that § 53-348 does not prohibit the passing of counterfeit United States currency and that, if it does, it is void as an attempt by this state to legislate on a matter which is exclusively within the province of the federal government, that is, the issuance and control of federal currency. See U.S. Const. art. I, § 8.

The salient facts found by the trial court can be stated in summary as follows: The defendant had in his possession at his home a counterfeit $100 bill which specified that "The United States of America will pay to the bearer on demand One Hundred Dollars." He told Arthur Lorensen that he, the defendant, could not pass this bill without arousing

note or bill for the payment of money, with intent to utter the same, or to permit it to be uttered with intent to defraud another, or any blank or unfinished note or bill made in the form or similitude of any promissory note or any bill for the payment of money made to be issued by any corporation, with intent to fill up and complete the same, or to permit it to be filled up and completed, in order to utter the same or to permit it to be uttered, to defraud another, or has in his possession or makes or engraves any plate or stone for forging or counterfeiting any check, certificate, promissory note or bill for the payment of money in the name of another or in the form or similitude of any check, certificate, promissory note or bill issued by any person or national banking association, with intent to forge or counterfeit the same, or to permit it to be forged or counterfeited, or sells, exchanges or gives in payment, or offers to sell, exchange or give in payment, any counterfeit gold or silver coin or any forged or counterfeited bill of exchange, promissory note, bank bill, certificate or check, with intent to have the same uttered, to defraud another, or falsely makes, forges or counterfeits any warrant, order, certificate or other public security, whereby money may be drawn from the treasury of this state or of any county, community or ecclesiastical society, or alters any such warrant, order, certificate or public security so that the same appears to be of greater value, or utters or gives the same in payment or offers to utter and give the same in payment, with intent to defraud this state or any person, shall be imprisoned not more than five years."

suspicion because he had previously been convicted of passing counterfeit money and had been sentenced to serve four years for so doing. He handed the bill to Lorensen and asked him to pass it. The next day Lorensen exchanged the bill in Wallingford for valid money which he gave to the defendant. Thereafter, the defendant and Lorensen went to Hartford, where the defendant secured several counterfeit $100 federal reserve notes from Rinaldo DePietrantoni for $25 each. Four of these were used by Lorensen, acting for the defendant, to purchase merchandise. The balance over the amount paid for the purchase was given to the defendant.

The defendant's first contention is that § 53-348 does not apply to federal currency because, by its legislative history as well as its language, it applies only to currency issued by the state of Connecticut. It is true that a very early predecessor of what is presently § 53-348 was concerned with paper currency issued by the colonies. An act of the General Court as early as 1750 mentions specifically "any of the Bills of Credit of this Colony; or of the Bills of Credit of the Provinces, or Colonies of the Massachusetts-Bay, New-York, New-Hampshire, Rhode-Island, and New-Jersey." Statutes, 1750, p. 24.[2] Later, however, in 1776, the General Court passed an act to prevent the counterfeiting of bills of public credit issued by the Continental Congress. 1 State Rec. 6.[3] In the Revision of 1784, the statute forbade the counterfeiting of "any of the Bills of Public Credit, emitted by the Authority of this State or . . . of the United States in Congress assembled." Statutes, 1784, p. 24. The substance of

[2] The compilation of 1808 contains references to earlier statutes. See Statutes, 1808, pp. 194-196 nn.

[3] See also 4 State Rec. 3.

this legislation was continued through the revisions of 1821, 1835, 1849, 1854 and 1866.[4] What is now § 53-348 appeared in its present form in the revision of 1875. Rev. 1875, p. 523, § 3. Neither it nor other enactments of that period contained specific reference to punishing the counterfeiting of bills issued by the United States, as did some of the earlier versions. The 1875 wording was continued through subsequent revisions.[5] During the years when the earliest versions of this legislation were in force, only colonial or provincial currency was specifically mentioned for the obvious reason that there was no federal currency. When a federal government as represented by the Continental Congress came into being and currency was issued under its authority as well as under the authority of the states, the federal currency was specifically protected by state legislation, as pointed out above. This legislation clearly manifested an intention not only to preserve the integrity of the federal currency in the furtherance of trade and commerce but also to protect the state and its citizens from being defrauded by spurious money.

Although attempts had been made to establish national banks, banking was, until 1863, handled almost exclusively by banking corporations organized under the laws of the states. 3 Encyc. Britannica, pp. 46, 47. In 1863, a national banking act was passed. This and subsequent federal legislation, notably that of 1865, 1913 and 1935, ultimately placed the issuance of paper currency exclusively in the hands of the federal reserve banks and the

---

[4] Statutes, 1821, pp. 133, 157; id., 1835, pp. 92, 127; id., 1849, pp. 199, 247; id., 1854, pp. 260, 336; Rev. 1866, pp. 215, 275.

[5] Rev. 1888, § 1578; Rev. 1902, § 1408; Rev. 1918, § 6511; Rev. 1930, § 6360; Rev. 1949, § 8686; Rev. 1958, § 53-348.

federal treasury. 6 Encyc. Britannica, p. 880. Consequently, it was unnecessary, in the Revision of 1875 and subsequently, to mention currency of the United States specifically. There was no other. That, together with the fact that successive revisions of the statutes, adopted by successive legislatures, continued the same wording, manifests a clear legislative intention to make the counterfeiting of federal money or the uttering of counterfeit federal money a crime against the state, punishable as such in the state courts. The rule that penal statutes are to be strictly construed need not be applied so tightly that an obvious legislative purpose or intent is stifled. *State* v. *Levy,* 103 Conn. 138, 141, 130 A. 96; *State* v. *Faro,* 118 Conn. 267, 273, 171 A. 660. The statute makes it a crime for anyone to utter any "counterfeited promissory note or bill for the payment of money" or "to permit it to be uttered with intent to defraud another." The notes here involved were counterfeit promissory notes, purported to have been issued by the federal reserve bank, wherein the United States promised to pay bearer $100. They clearly fall within the language of the statute.

The defendant claims further that the power to provide for the punishment of counterfeiting the securities and current coin of the United States is vested in the Congress by virtue of article 1, § 8, of the federal constitution and that the matter is therefore exclusively within the federal jurisdiction. A state is not precluded from legislating with respect to a particular subject by reason of the fact that the subject falls within the legislative power granted to the Congress by the federal constitution. An act may be made a crime by both state and federal legislation. *Hoxie* v. *New York, N.H. & H.R.*

*Co.,* 82 Conn. 352, 365, 73 A. 754; *State* v. *Ceriani,* 96 Conn. 130, 132, 113 A. 316; *State* v. *Tuller,* 34 Conn. 280, 297; *In re Dixon,* 41 Cal. 2d 756, 763, 264 P.2d 513; *Nastasi* v. *Aderhold,* 201 Ga. 237, 240, 39 S.E.2d 403; *California* v. *Zook,* 336 U.S. 725, 731, 69 S. Ct. 841, 93 L. Ed. 1005; *United States* v. *Lanza,* 260 U.S. 377, 381-384, 43 S. Ct. 141, 67 L. Ed. 314. In the case at bar, we are dealing with the passing of counterfeit currency as distinguished from the process of counterfeiting. In *Fox* v. *Ohio,* 46 U.S. (5 How.) 410, 433, 12 L. Ed. 213, the Supreme Court of the United States pointed out that the offense of counterfeiting was one directly against the government, but that the offense of passing base coin was a private wrong affecting the government only remotely. See *Nastasi* v. *Aderhold,* supra. Whether the distinction between counterfeiting and passing still merits consideration is doubtful. It has been held that punishment for counterfeiting, as well as for the fraudulent passing of counterfeit money, is within the proper exercise of the police power of the state. *In re Dixon,* supra; *Harlan* v. *People,* 1 Doug. 207, 211 (Mich.); see *In re Truman,* 44 Mo. 181, 184. In later years, the Supreme Court of the United States has expressed the same view. *Sexton* v. *California,* 189 U.S. 319, 322, 323, 23 S. Ct. 543, 47 L. Ed. 833; *United States* v. *Arjona,* 120 U.S. 479, 487, 7 S. Ct. 628, 30 L. Ed. 728. There is nothing repugnant or contradictory to constitutional principles or to our federal system of government in the concurrent exercise of the power to impose sanctions on the counterfeiting of federal currency or the passing of counterfeit federal currency. Although the possibility of double jeopardy, arising from state and federal prosecution for the same act, was acknowledged over a century ago

in *Fox* v. *Ohio,* supra, 434, the concept of dual sovereignties was advanced to justify the situation. *Bartkus* v. *Illinois,* 359 U.S. 121, 129, 79 S. Ct. 676, 3 L. Ed. 2d 684, rehearing denied, 360 U.S. 907, 79 S. Ct. 1283, 3 L. Ed. 1258; *Abbate* v. *United States,* 359 U.S. 187, 193, 79 S. Ct. 666, 3 L. Ed. 2d 729. Both the federal and state governments have the power to deal with the matter, the federal government for the purpose of protecting the purity of its currency, the states for the purpose of protecting their citizens against fraud. *Bartkus* v. *Illinois,* supra; *In re Dixon,* supra; *Nastasi* v. *Aderhold,* supra; *In re Truman,* supra; 14 Am. Jur. 176, § 6. The defendant's claim is without merit.

The defendant's final argument is that even if state jurisdiction was once permissible, the Congress has preempted the field and all state enactments are superseded. The United States Code, in the sections relating to counterfeiting (18 U.S.C. §§ 471-473) shows a clear intent not to deprive the state of jurisdiction. It provides that "nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several states under the laws thereof." 18 U.S.C. § 3231; *In re Dixon,* supra, 764; *People* v. *Fury,* 279 N.Y. 433, 437, 18 N.E.2d 650. The defendant takes nothing by this claim.

There is no error.

In this opinion the other judges concurred.